## UPINGTON v. KEENAN.

(Supreme Court, General Term, First Department. January 13, 1893.)

1. NEW TRIAL—NEWLY-DISCOVERED EVIDENCE.

　　In an action for money loaned, plaintiff testified that he had loaned defendant $48,000, but had neither received any security therefor, nor any paper from defendant acknowledging its receipt; that he relied on what another had told him of defendant's responsibility; that he made the loan because defendant was to "put him into something good." He produced what he claimed was his bank account, and showed drafts for sums to the amount of the alleged loans. On cross-examination he said that he had formerly represented a lottery company, but at the time of the alleged transaction was a stockbroker, and made $6,000 a month. The only corroboration was that of one B., who testified that he was present when defendant received $5,000 from plaintiff. On cross-examination B. said he had been in the employ of a certain firm at Buffalo until he came to New York, in 1881, when the alleged loan was made. Defendant moved for a new trial on the ground of newly-discovered evidence to the effect (1) that B. had not been in the employ of the firm at Buffalo since 1876; (2) that plaintiff was employed in the lottery business by two parties, and received a salary of $100 a month from one, and half the profits from the other; that the money kept in plaintiff's name at the bank did not belong to him; and that, when accounting for the money in the bank, plaintiff never claimed to have paid any money to defendant. *Held,* that the evidence tended to show that plaintiff's claim had no foundation in fact, and a new trial should have been granted.

2. WITNESS—CREDIBILITY—CONNECTION WITH LOTTERY.

　　A witness is not to be discredited because he is in the lottery business, as that is a question for the jury.

Appeal from special term, New York county.

Action by George P. Upington against John Keenan for the recovery

of money. There was a verdict for plaintiff. From an order denying a motion for a new trial on the ground of newly-discovered evidence, defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and O'BRIEN and BARRETT, JJ.

Bliss & Schley, (Geo. Bliss, of counsel,) for appellant.

Rudd, Hunt & Wilder, (James M. Hunt, of counsel,) for respondent.

VAN BRUNT, P. J. This motion is opposed upon the part of the plaintiff upon the ground that there are certain rules governing the disposition of motions of this kind which must be complied with in order to entitle a party to relief; and that the defendant in this action has not complied with these requirements. It is undoubtedly true that in a large number of cases certain features have been referred to as necessary to be present upon motions of this kind, in order that relief might be granted. But it will be found upon an investigation of those cases, and of the principles upon which they were founded, that the peculiarities of each case necessarily varied the rules which upon this application are claimed to be invariable, and that there is no absolute criterion which can be held to govern in all cases, and the peculiarities of each must determine as to whether or not the evidence claimed to be newly discovered is of such a character as calls upon the court to set aside the judgment, and allow the defeated party an opportunity to introduce the same before a jury. In the case of Dillingham v. Flack, (Sup.) 17 N. Y. Supp. 867, the motion was denied because there was no newly-discovered evidence, and that the principal ground on which a new trial was asked was to allow witnesses already sworn to revise their testimony, because, upon reflection and consideration, and talking with other people, they had come to the conclusion that they were mistaken somewhat in the sequence of events, and upon the further ground that there was no evidence but that the newly-discovered evidence was all within the reach of the plaintiff at the time of the trial, and could have been procured. The fact that the rules alleged to govern applications of this kind are not invariable was illustrated, notably, in the cases of Clegg v. Union, 51 Hun, 232, 4 N. Y. Supp. 280, and Silver Plate Co. v, Barclay, 48 Hun, 54, and also in the case of Sistare v. Olcott, (Sup.) 5 N. Y. Supp. 114, in all of which cases it was held, as a sufficient ground for a new trial, that the newly-discovered evidence would probably, upon a new trial, bring about a result favorable to the party making the application; and that this conclusion must necessarily be arrived at by considering the nature of the evidence by which the successful party has established either his claim or defense, and the nature of the newly-discovered evidence.

Now, in the case at bar, what is the plaintiff's claim, which he has attempted to establish almost solely by his own evidence? It is that some time prior to May, 1881, he had a conversation with his uncle, George Caulfield, who told him that the defendant had applied to him (Caulfield) to borrow money, and that he had advised the defendant to apply to the plaintiff, and that he advised the plaintiff to loan the

money, because the defendant was at this time a powerful man, and had great influence, and would appreciate any confidence put in him. The plaintiff prior to this time had met the defendant, having been introduced to him by Caulfield, and had become on intimate terms with him. That the defendant applied to him about the middle of May, 1881, to borrow money, referring to what Caulfield had said. That the defendant had stated that he wanted $6,000 as soon as he could get it, and would want about $6,000 about a month after, and about the same amount the month following that. The plaintiff did not let the defendant have the money then, but fixed a time when he would be in a position to loan him the money. The plaintiff thereupon went to Denver, Colo., and returned about the middle or latter part of June. On his return, he saw the defendant, and also sent him word by Caulfield that he was disposed to do what the defendant asked him to do. In July, the plaintiff had a conversation with the defendant at his (plaintiff's) office, at 599 Broadway, in which the defendant asked him if he had any objection to his uncle (referring to Caulfield) calling for the money, because he had reasons of his own for not receiving the money direct, and the plaintiff told him he had not; that such a plan was entirely satisfactory to him,—and Caulfield first called for money in the neighborhood of the 11th of August, 1881, and was paid $1,000. When the plaintiff asked him for a receipt, he replied that he did not think John (referring to defendant) wanted any writing between them. The plaintiff then asked him, "What proof would I have whether Mr. Keenan would acknowledge to have received this money from me?" Caulfield said, "You have me." The plaintiff then told him: Of course, he knew that, but, in case he died, where was he? That he wanted some more proof than that, and that, before he would pay any more money, he would have to see Keenan, in order to learn what secrecy there was about the matter. Subsequently, at a casual meeting at Parker's, the plaintiff learned from Keenan that he had got the $1,000. In August—under direct examination, stated by the plaintiff to be the 20th, and, upon cross-examination, the 24th—the plaintiff claimed to have paid to Keenan, direct, at Sieghortner's restaurant, $5,000 in money, upon which occasion he told Keenan the doubts in his mind with regard to paying this money over, and that there was a certain sense of insecurity in his mind, and he wanted to know if there was any way by which Keenan could make him think differently. "Well," said the defendant, "this is not the first time I have used your uncle in matters of this kind, and I have always found him correct, and I trust him; and I don't see why you can't." "Then," continued the plaintiff, "I made the same remark to him,—' In case Caulfield dies, where am I?' Keenan said, ' That is so,' and asked me if I could suggest anything. I said, ' Well, I could not suggest anything further, except that I have a man in my employ, and that he would be obliged to know about the loan,— in fact, did know about the loan, and what was going on;' that I had come back from Denver, and was just about to make up my books, and that I had employed this man, and he knew what I was going to do. I then said, "Shall I call him in?" He said, "Do you trust

him?" I said, "I do." He said, "Call him in, then." In this gentle-man's presence, I then stated the kind of loan I was to make to Keenan, and the payment I was to make, and Keenan confirmed it. I took out of my pocket, and gave him, the money,—$5,000; and he took it, and counted it, and said, ' All right.' " At this interview, conversation was had between the plaintiff and the defendant in regard to future loans which the plaintiff promised to make if it did not embarrass him. Subsequently the plaintiff received a letter from Caulfield, asking him to call (under date of August 31, 1881) "to-morrow," and bring him $1,000. In response to that letter, in the vicinity of September 2d, the plaintiff paid, in bills, $1,000. He subsequently made various payments, all of which were to Caulfield, and after each payment he accidentally saw Keenan, and learned from him that he got the money; the last payment being made in March, 1882, when the plaintiff sent word to the defendant that he would loan him no more money, and wanted him to return a good part of the money as soon as he could. All these payments were made in bills, except one, which the plaintiff claimed to have offered to make in a check, which was refused; and he, not being able to get bills, procured gold, and deposited it to the credit of Caulfield, in his bank account. The total amount of the loan was $48,000, being $6,000 a month. The plaintiff got no security for any part of the moneys loaned Keenan, nor any paper or acknowledg-ment for any of the money; he claiming to rely entirely upon what Caulfield said to him of Keenan's responsibility, and that he (Caulfield) would see that he got the money back. The plaintiff testified that what influenced him to make the loan was that the defendant was going to befriend him, and put him into something good,—show him how to make some money; the plaintiff at this time making, according to his own story, $72,000 a year out of his business. The plaintiff also intro-duced what he claimed to be his bank account in the Pacific Bank, show-ing drafts of sums of money sufficient in amount to make the loans in question. Upon cross-examination it appeared that the plaintiff, from 1877 to December, 1879, was in the employ of the Erie Railroad Com-pany as a clerk, and from December, 1879, for about a year, he repre-sented the Kentucky State Lottery Company, having his office at 599 Broadway. Having found out, as he claims, that such business was illegal, he discontinued his representation of the lottery, but continued a general brokerage business at the same office, (broker in stocks, notes, and mortgages; western notes and mortgages; selling fractional lots of stock,) from which business he made at least $6,000 a month from about May, 1881, down to the time when he swore to the complaint,— the jurat bearing date the 7th of June, 1890. This statement, how-ever, he corrects immediately afterwards by saying that the brokerage business continued down to September, 1882, and that he was selling irrigated lands and bonds and mining property for certain people in Denver, and that this was the source from which this money came.

The only corroboration offered by the plaintiff to this extraordinary story was that of the witness Barnes, who testified that he was present at the time the plaintiff gave to the defendant the $5,000, upon which

occasion the plaintiff testified that, in Barnes' presence, he stated the kind of loan he was to make, and the payments he was to make to Keenan, having called him over for that purpose. But Barnes testified that he did not hear any conversation between them in regard to money transactions, except the words, "There is the $5,000," to which Keenan replied, "All right." This man, upon cross-examination, testified that he left Buffalo in the month of August, 1881, to come to New York, and that up to that time he had been in the employ of the New York Stockyard Company, and that in August, 1881, he was in the employ of the Merchants' Union Transportation Company, on Broadway, corner of Worth, and that it was during this time that he went to Upington's office, looking over his accounts. The defendant and Caulfield denied having received this money, and, the jury having found a verdict for the plaintiff, this motion was made for a new trial, upon the ground of newly-discovered evidence—First, evidence showing that Barnes had not been in the employ of the stockyard company in Buffalo since 1876; next, that the plaintiff was in the employ of certain persons engaged in the lottery business at 599 Broadway, where there had been a consolidation of the business; and that the account kept in his name in the Pacific Bank did not represent money belonging to Upington; and that from one of the parties interested he received a salary of $100 a month, and from another half of the profits; and that he had never claimed, when accounting for the money belonging to these parties in the Pacific Bank, to have paid any money to Keenan, the defendant.

Now, in view of the extraordinary claim of this plaintiff; the fact of the secrecy attending all these loans; that he has not a scrap of paper or a single particle of evidence of this indebtedness, nor a single witness who can be called credible, to support his extraordinary story; that he gave no credible explanation as to the manner in which he got this money, claiming, on the one hand, to be in receipt of an income of $6,000 a month from a mythical business, and on the other that he was influenced to loan this money because of something good the defendant might put him in,—it seems to us that evidence tending to show that this remarkable claim had no foundation in fact ought not to be shut out by any court. It is true it is claimed that some of the witnesses offered on defendant's behalf are in the lottery business, and are therefore to be discredited. But that is a question for the jury. They are certainly no more engaged in the lottery business than the plaintiff himself was during the time he was representing these combined lottery schemes at 599 Broadway; and the idea that it was because of some compunctions of conscience, and because he found out that lotteries were illegal, that he relinquished this agency, is scarcely worthy of a moment's discussion. If there had been a loan of money to the defendant to the large amount testified to by the plaintiff, it is absolutely incredible that he should have nothing whatever to show to support it; and the very fact of the secrecy attending the alleged transaction, as an excuse for the failure to produce the papers which would ordinarily attend a transaction of this description, stamps the whole alleged loan with suspicion, to say the least. Under these circumstances, with this re-

markable claim supported by this remarkable evidence, it seems to us that anything that will throw light upon the transaction ought to be allowed to be introduced. The claim that this evidence might have been produced upon the trial is unfounded. There is nothing to show that the defendant had any reason to apprehend that the witnesses could give the testimony which it is now claimed they could give. Neither could the defendant, in advance of the trial, anticipate the story which the plaintiff rehearsed upon the witness stand. We are of opinion that the motion should have been granted in the court below. The order appealed from should be reversed, with $10 costs and disbursements, and the motion granted, upon payment of the costs and disbursements of the trial, and such costs of the appeal from the judgment as might have been taxed at the time of the decision of the original motion. All concur.